No. 15-2225

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

**THE STATE OF NORTH CAROLINA,**
by and through it agency,
the North Carolina Department of Administration,

*Plaintiff-Appellant,*

v.

**ALCOA POWER GENERATING, INC.,**

*Defendant-Appellee.*

─────────────

On Appeal from the United States District Court
for the Eastern District of North Carolina
Western Division

─────────────

BRIEF OF APPELLANT

─────────────

**ROY COOPER**
**North Carolina Attorney General**
Donald R. Teeter, Sr.
Ann W. Matthews
Special Deputy Attorneys General
G. Mark Teague
Lewis W. Lamar, Jr.
Assistant Attorneys General
North Carolina Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602-0629
Telephone: (919) 733-7408
drteeter@ncdoj.gov

# TABLE OF CONTENTS

CORPORATE DISCLOSURES ................................................... COA DKT. NO. 7

TABLE OF CONTENTS ........................................................................ i

TABLE OF AUTHORITIES ................................................................. v

JURISDICTIONAL STATEMENT ........................................................ 1

ISSUES PRESENTED ........................................................................ 1

STATEMENT OF THE CASE AND FACTS ........................................ 2

SUMMARY OF ARGUMENT ........................................................... 4

ARGUMENT ................................................................................... 4

Introduction:  North Carolina History and Its Inland Waters ................................... 4

I.  THERE IS NO FEDERAL JURISDICTION OVER THE
    STATE'S COMPLAINT ............................................................... 7

    A.    The Standard Of Review Is *De Novo.* .................................. 7

    B.    Removal Jurisdiction Arises Only From The Well-Pleaded
    Complaint Rule ....................................................................... 7

    C.    On Its Face The State's Complaint Raises No Issue Of Federal
    Law ......................................................................................... 9

    D.    No Substantial Federal Question Is Otherwise Raised By The
    Complaint

        1)  The Equal Footing Doctrine Provided No Independent Basis
    For Federal Question Jurisdiction .................................. 11

        2)    Resolution Of The State's Claim Of Title Did Not
    "Necessarily Depend" On Federal Law ...................... 16

3)   Any Purported Federal Issue Of Navigability Is Not Substantial ...................................................................19

E.   Federalism Concerns Strongly Suggest That Title To Riverbeds In The Original States Should Be Left To Those States Alone ..............20

F.   There Is No Genuine Dispute As To The Meaning Of The Constitution Or Any Act Of Congress .......................................................21

II.   THE DISTRICT COURT ERRED BY GRANTING ALCOA'S SECOND MOTION FOR SUMMARY JUDGMENT APPLYING THE NORTH CAROLINA MARKETABLE TITLE ACT. ........................22

A.   Standard Of Review ...................................................................22

B.   The North Carolina Marketable Title Act Does Not Apply To Riverbeds Which The State Acquired From The British Crown By Virtue Of Sovereignty .......................................................22

C.   1885 N.C. Sess. Laws, c. 212 Prevented Title To The Bed Of The Yadkin From Being Vested In Alcoa Under The MTA ..............27

D.   Even If The MTA Applied, There Is A Genuine Dispute Of Material Fact As To The True Boundaries Of The Historic Bed Of The Yadkin River Claimed By Alcoa. ...........................................29

E.   Even If The MTA Did Apply, There Are Genuine Disputes Of Material Fact As To Alcoa's Actual Possession Of The Claimed Portion Of The Historic Bed Of The Yadkin River Under Known And Visible Boundaries. .............................................30

III.   THE DISTRICT COURT ERRED BY GRANTING APPELLEE'S SECOND MOTION FOR SUMMARY JUDGMENT ON ADVERSE POSSESSION ...................................................................32

A.   Standard Of Review .........................................................................32

**B.**    N.C. Gen. Stat. 1-45.1 Prohibits Acquisition Of Title To The Historic Bed Of The Yadkin Against The State By Adverse Possession..............................................................................32

C.    The Trial Court Erred In Entering Summary Judgment In Favor Of Alcoa On The Basis Of Adverse Possession Because Genuine Disputes Of Material Fact Exist Pertaining To Adverse Possession ...............................................................35

IV.   THE DISTRICT COURT'S FINDINGS OF FACT AS TO NAVIGABILITY ARE NOT SUPPORTED BY THE EVIDENCE AND ARE CLEARLY ERRONEOUS.

A.    Standard Of Review ..........................................................40

B.    The District Court Erred In Finding That "The Parties Stipulated That The Relevant Segment For The Purposes Of Navigability Is The 45-River-Mile Segment Of The Historic Riverbed."..................................................................41

C.    The Trial Court's Finding That "[T]he Historical Record Of Use For Navigating The Relevant Segment Is Minimal" Is Clearly Erroneous. ..........................................................42

D.    The Trial Court's Finding That "[T]he Historical Record Of Use For Navigating The Relevant Segment Is Minimal" Is Clearly Erroneous. ..........................................................46

V.   THE DISTRICT COURT'S CONCLUSIONS OF LAW AS TO NAVIGABILITY ARE AFFECTED BY ERRORS OF LAW ...................47

A.    Standard Of Review ..........................................................47

B.    The District Court Erred As A Matter Of Law In Concluding That Portages Of The Falls And The Narrows Necessarily Defeated A Finding Of Navigability Of The Entire Section Of The River At Issue..............................................................47

C.    The District Court Erred As A Matter Of Law In Finding That It "Cannot Conclude That The Relevant Segment Was

Navigated Or Was Susceptible To Navigation For Commerce Given The Lower Half's Geomorphology." ....................................48

D.    The District Court Erred As A Matter Of Law In Concluding That "The Relevant Segment Was Never Navigable For Commerce Nor Susceptible Thereto" And That If It Were "Navigable Or Susceptible For Navigation In Its Natural State, There Would Be No Need For Significant Improvement." ...............51

E.    The District Court Erred As A Matter Of Law In Concluding That Lack Of Mention Of Navigation In The Moravian Records Was Persuasive Evidence Of Non-navigability. ...................52

F.    The District Court Erred As A Matter Of Law In Concluding That Lt. General Nathanael Greene's Use Of The River As A Barrier Was Persuasive Evidence Of Non-navigability. .....................54

CONCLUSION ...........................................................................................55

REQUEST FOR ORAL ARGUMENT ...................................................55

CERTIFICATE OF COMPLIANCE ......................................................57

CERTIFICATE OF SERVICE ................................................................58

# TABLE OF AUTHORITIES

Cases

*Bauman v. Woodlake Partners, LLC,*
　199 N.C. App. 441, 681 S.E.2d 819 (2009)..........................................23

*Broadnax v. Baker,*
　94 N.C. 675,  1886 N.C. LEXIS 124 (1886) .......................................18

*Carolina Sand v. Northbrook Carolina Hydro,*
　2002 WL 34146903 (N.C. Super. Forsyth County) .............................28

*Caterpillar, Inc. v. Williams,*
　482 U.S. 386 (1987)..............................................................................8

*Christianson v. Colt Indus. Operating Corp.,*
　486 U.S. 800 (1988)............................................................................18

*Club Comanche, Inc., v. Gov't of the V.I.,*
　278 F.3d 250 (3rd Cir. 2002) ............................................................8, 9

*Coastal Petroleum Co. v. American Cyanamid Co.,492 So.2d 339 (1986) ...........25*

*Dixon v. Coburg Dairy,*
　369 F.3d 811 (4th Cir. 2004) ................................................. 7, 16, 17

*Dunlap v. Carolina Power & Light Co.,*
　212 N.C. 814, 195 S.E. 43 (1938) .....................................................38

*Fabrikant v. Currituck County,*
　174 N.C. App. 30, 621 S.E.2d 19 (2005) ..........................................24

*Fish House, Inc. v. Clarke,*
　204 N.C. App. 130, 693 S.E.2d 208 (2010) ......................................33

*Flying Pigs, LLC v. RRAJ Franchising, LLC,*
　757 F.3d 177 (4th Cir. 2014) ................................................... passim

v

*Franchise Tax Bd. v. Construction Laborers Vacation Trust*,
   463 U.S. 1 (1983).................................................................................8

*Grable & Sons Metal Products v. Darue Eng'g & Mfg*.,
   545 U.S. 308 (2005)................................................................ 10, 19, 20

*Gully v. First National Bank*,
   299 U.S. 109 (1936)............................................................................8

*Gunn v. Minton*,
   133 S. Ct. 1059 (2013)........................................................... 10,19, 21

*Gwathmey v. State ex rel. Dep't of Env't Health &*
   *Natural  Res.*, 342 N.C. 287, 464 S.E.2d 674 (1995) ................................. passim

*Hoschar v. Appalachian Power Co*.,
   739 F.3d 163 (4th Cir. 2014) .............................................................7

*Kraft v. Town of Mt. Olive*,
   183 N.C. App 415, 645 S.E.2d 132 (2007) .......................................24

*Land Co. v. Hotel*,
   132 N.C. 517, 44 S.E. 39 (1903) ....................................................6, 33

*Locklear v. Savage*,
   159 N.C. 236, 74 S.E. 2d  (1912) ......................................................36

*McDaris v. Breit Bar* "T" *Corp.*,
   265 N.C. 298, 144 S.E.2d 59 (1965) .................................................40

*Martin v. Waddell*,
   41 U.S. 367 (1842)................................................................ 16, 17, 23

*Maryland Stadium Authority. v. Ellerbe Becket, Inc*.,
   407 F.3d 255 (4th Cir. 2005) .............................................................7

*Mereish v. Walker*,
   359 F.3d 330 (4th Cir. 2004) ........................................................ 22, 32

*Mobil Oil Corp. v. Coastal Petroleum Co.*,
   671 F.2d 419, 426 (11th Cir.), *cert. denied*,
   459 U.S. 970 (1982)..........................................................................19

*Mobley v. Griffin*,
   104 N.C. 112, 10 S.E. 142, (1889) ......................................................26

*Mulcahey v. Columbia Organic Chems.Co.*,
   29 F.3d 148 (4th Cir. 1994) ................................................................17

*Nature Conservancy v. Machipongo Club, Inc.*,
   579 F.2d 873 (4th Cir. 1978) ..............................................................27

*Oregon, ex rel State Land Board v. Corvallis*,
   429 U.S. 363 (1977)...........................................................................14

*Pearson v. Pearson*,
   227 N.C. 31, 40 S.E.2d 477 (1946) .....................................................18

*Phillips Petroleum Co. v. Mississippi*,
   484 U.S. 469 (1988)...........................................................................13

*Pinney v. Nokia, Inc.*,
   402 F.3d 430, (4th Cir. 2005) .............................................................16

*Pollard v. Hagan*,
   44 U.S. 212 (1845)...................................................................... 11, 12

*PPL Montana, LLC v. Montana*,
   132 S. Ct. 1215 (2012)............................................................. passim

*Shively v. Bowlby*,
   152 U.S. 1 (1894)........................................................................ 12, 16

*Shulthis v. McDougal*,
   225 U.S. 561 (1912)...........................................................................22

*Sledge v. Miller*,
   249 N.C. 447, 106 S.E.2d 868 (1959) .................................................26

vii

*Snyder v. Citimortgage, Inc.,* 559 Fed. Appx. 241 (4th Cir. 2014). ......................7, 9

*State ex rel. Rohrer v. Credle*
   322 N.C. 522, 369 S.E.2d 825 (1988) ......................................................... 23, 25

*State v. Brooks*,
   279 N.C. 45, 181 S.E.2d 553 (1971)....................................................... 17, 27, 29

*Swan Island Club, Inc. v. White*,
   114 F. Supp. 95 (E.D.N.C. 1953),
   *aff'd sub nom. Swan Island Club, Inc. v. Yarborough*,
   209 F.2d 698 (4th Cir. 1954) .................................................... 4, 5, 6, 25

*Tatum v. Sawyer,*
   9 N.C. 226, 1842 N.C. LEXIS 49 (1822) ......................................................6, 25

*Taylor v. Johnston*,
   289 N.C. 690, 224 S.E.2d 567 (1976) .................................................. 26, 27, 31

*The Montello*,
   87 U.S. 430 (1874).........................................................................................52

*Town of Nags Head v. Toloczko*,
   728 F.3d 391 (4th Cir. 2013) ..............................................................27

*United States v. Hall*,
   664 F.3d 456 (4th Cir. N.C. 2012)............................................................ 41, 47

*United States v. Utah*,
   283 U.S. 64 (1931)..................................................... 46, 48, 51, 52, 53

*United States v. Watson*,
   793 F.3d 416 (4th Cir. Va. 2015).........................................................41

*Ward v. Willis*,
   51 N.C. 183 (1858) (*per curiam*).................................................................5, 25

*Wilson County Bd. Educ. v. Lamm*,
   276 N.C. 487, 173 S.E.2d 281 (1970) ..........................................................36

*Wilson v. Forbes*,
   13 N.C. 30 (1828) ...................................................................5

**Constitutions, Statutes and Rules**

U.S. Const. art. I, sec. 8 ........................................................16

U.S. Const. art. III, sec. 2 ......................................................16

28 U.S. C. § 1291 ...................................................................1

28 U.S.C. § 1331 ....................................................................8

28 U.S.C. § 1441(a) ..............................................................7, 8

1 U.S. Stats. 52 ....................................................................11

Fed. R. Civ. P. R 52(6) (2015) ..............................................41

N.C. Gen. Stat. § 1-45.1 (2015) .......................25, 30,31, 33, 34

N.C. Gen. Stat. § 1-253 (2015) ...............................................9

N.C. Gen. Stat. § 47B-1 ........................................................26

N.C. Gen. Stat. § 47B-2(c) (2015) ........................................24

N.C. Gen. Stat. § 47B-3(3) (2015) ...................................30, 32

N.C. Gen. Stat. § 47B-8(1) (2015) ........................................26

N.C. Gen. Stat. § 76-40 (2015) .............................................25

N.C. Gen. Stat. § 113-131 (2015) ....................................25, 31, 32

N.C. Gen. Stat. § 113-205 (2015) .........................................25

N.C. Gen. Stat. § 146-3(1) (2015) ...................................25, 35

N.C. Gen. Stat. § 146-79 (2015) ....................................*passim*

N.C. Gen. Stat. § 206 (2015) ..............................................................25

N.C. Pub. Law, 1885 ch. 212 ("1885 Act" or "the Act") ................................28, 34

Act of 1715, ch. 6, sec. 3...................................................................5

Act of 1777, ch. 114, sec. 10...............................................................5

*An Act to Incorporate the Tallassee Power Company*
   (1905 N.C. Sess. Law 122) ...............................................................36

## Secondary Sources

2016 <u>Encyclopædia Britannica, Inc.</u>,
   http://www.britannica.com/topic/barter-trade ......................................45

*Black's Law Dictionary* 576 (8th ed. 2004)...............................................11

David A. Rice, Estuarine Land of North Carolina: Legal Aspect of
   Ownership, Use and Control, 46 N.C. Law Rev. 779 (1968)..............................14

D. Slade, *Putting the Public Trust Doctrine to Work* (1990) ("Slade") ............14, 15

M. Kalo & J. Kalo, *The Battle to Preserve North Carolina's Estuarine
   Marshes*, 64 N.C.L. Rev. 565 (1986) .............................................26, 40

P. Hetrick and J. McLaughlin, Jr., *Webster's Real Estate Law in North
   Carolina* § 25.02 (6th Ed. 2011)....................................................27

## JURISDICTIONAL STATEMENT

Pursuant to 28 U.S.C. § 1291, the State of North Carolina from a final judgment entered by the United States District Court for the Eastern District of North Carolina, Western Division, case 5:13-CV-00633-BO.

## ISSUES PRESENTED

A.    Whether the district court erred in denying the State's motion to remand.

B.    Whether the district court erred in exercising jurisdiction of this matter based on any substantive federal issue.

C.    Whether the district court erred by applying federal navigability law for determining title to the bed of the Yadkin River in North Carolina, one of the original thirteen sovereign states.

D.    Whether the district court erred in its application of federal law in this case.

E.    Whether the district court erred in its Findings of Fact and Conclusions of Law on navigability.

F.    Whether the district court erred in entering summary judgment vesting title in Alcoa based upon the North Carolina Marketable Title Act ("MTA"), contrary to controlling North Carolina precedent.

1

G.     Whether the district court erred in entering summary judgment vesting title in Alcoa by adverse possession, contrary to controlling North Carolina precedent.

## STATEMENT OF THE CASE AND FACTS

The State brought this declaratory judgment action in State Court seeking a judicial declaration of title to a 45-mile stretch of the historic bed of the Yadkin River ("Yadkin") claimed by Alcoa Power Generating, Inc. ("Alcoa").

Alcoa removed the case to the Eastern District of North Carolina. The State moved for remand based on lack of subject matter jurisdiction, Eleventh Amendment sovereign immunity, and alternatively, abstention. JA 89. The district court denied the State's motions, concluding that ownership of the contested riverbed depended upon a determination of navigability at statehood using federal law under the equal footing doctrine, citing *PPL Montana, LLC v. Montana*, 132 S. Ct. 1215, 1227 (2012). JA 94.

The parties filed cross-motions for summary judgment. Alcoa sought summary judgment on non-navigability, adverse possession, waiver, and equitable defenses no longer at issue here. The district court denied Alcoa's motion. JA 220. The State moved for partial summary judgment on several independent grounds, including its *prima facie* case for ownership of the riverbed at statehood, navigability at statehood, adverse possession, unconnected chain of title,

2

prescriptive easement and laches. JA 220. The district court granted summary judgment on the State's *prima facie* title to the riverbed at statehood, pursuant to N.C. Gen. Stat. § 146-79, which provides:

> [i]n all controversies and suits for any land to which the State . . . shall be a party, the title to such lands shall be taken and deemed to be in the State . . . until the other party shall show that he has a good and valid title to such lands in himself.

The district court also awarded partial judgment to the State on estoppel and waiver, but denied the remainder of the State's motion. JA 220.

The district court ordered the sole issue of navigability be tried first. Pursuant to Alcoa's motion, the district court placed the burden of proof on navigability on the State. JA 265. The navigability hearing took two days, with testimony from five witnesses and the introduction of 72 documentary exhibits. DE 180, 181. At the conclusion of the second day of the trial, after taking only a five minute recess, the district court ruled from the bench that the entire 45-mile stretch of the contested riverbed was not navigable at statehood. JA 268.

At the district court's invitation, Alcoa filed a second summary judgment motion based on the MTA, adverse possession, and laches. JA 1309, 1798. The district court granted the motion based on the MTA and adverse possession, purportedly vesting title in Alcoa. JA 1899, 1954. The State appealed. JA 1956.

## SUMMARY OF THE ARGUMENT

The district court lacked subject matter jurisdiction because no federal issue arose from the Complaint. Federal navigability law under the equal footing doctrine ("EFD") does not apply to the original thirteen states and navigability of inland waters for purposes of title in those states is exclusively a matter of state law. Even if the federal law set forth in *PPL* were applicable, the district court erred in applying that law, not segmenting the non-navigable portions of the Yadkin from the navigable. The district court also erred in granting summary judgment to Alcoa on the basis of adverse possession and the MTA. Finally, the district court's finding that the Yadkin was not navigable at the time of statehood was clearly erroneous as a matter of fact and law.

## ARGUMENT

**Introduction: North Carolina History and Its Inland Waters**

Originally, the State was the owner of the soil within its boundaries including that covered by water, whether navigable or not, except land lawfully granted by the British Crown prior to July 4, 1776. *Swan Island Club, Inc. v. White*, 114 F. Supp. 95, 99 (E.D.N.C. 1953), *aff'd sub nom. Swan Island Club, Inc. v. Yarborough*, 209 F.2d 698 (4th Cir. 1954). The distinction between navigable and non-navigable was and is significant chiefly because of the public trust doctrine and the public uses associated with navigable waters under that doctrine,

4

and also because of significant restrictions on the ability of the State to convey land beneath navigable waters. *Id.* at 100. State law has now been clarified, recognizing the Legislature's power to convey land free of public trust rights, but only "if the special grant does so in the clearest and most express terms." *Gwathmey v. State ex rel. Dep't of Env't Health & Natural Res.*, 342 N.C. 287, 304, 464 S.E.2d 674, 684 (1995).

As early as 1715 the colonial legislature provided instructions to surveyors for lands "that lie on navigable rivers and creeks." Act of 1715, ch. 6, sec. 3. The year after declaring independence, the Legislature provided statutory guidance for handling surveys "on any navigable water." Act of 1777, ch. 114, sec. 10. These acts regulated "entries and surveys on which to found a grant," *Ward v. Willis*, 51 N.C. 183, 184 (1858) (*per curiam*), and regulated all surveys on land abutting navigable waters identically, whether a sea, bay, river or creek. *Id.*[1] Unlike English common law, North Carolina's concept of navigability was not limited by tidal ebb and flow; otherwise, neither Albemarle nor Pamlico Sounds would have been considered navigable, and they "would be the subject of private property," an untenable result. *Wilson v. Forbes*, 13 N.C. 30, 35 (1828).

---

[1] The entry and grant system is briefly summarized in David A. Rice, Estuarine Land of North Carolina: Legal Aspect of Ownership, Use and Control, 46 N.C. Law Rev. 779, 786 (1968).

From earliest times the policy of the State has been to preserve its title to its waters. *Land Co. v. Hotel*, 132 N.C. 517, 533, 44 S.E. 39, 44 (1903). In *Tatum v. Sawyer,* 9 N.C. 226 (1822), the North Carolina Supreme Court held that lands covered by navigable waters were not subject to entry and grant under the law of 1777, not by any express prohibition in the Act, but because the Legislature could not be presumed to have intended such result, as those waters were necessary for public purposes as common highways. *See Swan Island Club, Inc.*, 209 F.2d at 701 (legislature did not intend Torrens Act proceedings to vest title to land under navigable water). State law recognizes the Legislature's power to convey land free of public trust rights, but only "if the special grant does so in the clearest and most express terms." *Gwathmey,* 342 N.C. at 304, 464 S.E.2d at 684.

Beginning in 1776 what waters were navigable within the State's borders was solely a matter of its law. Between the Revolution and joining the Union in 1789, North Carolina's was the only law having any bearing on whether its inland waters were navigable or how navigability was to be determined. When it joined the Union, North Carolina retained sovereign title to all lands and waters that had not been granted away lawfully by any preceding sovereign. After that, North Carolina's remained the only law applicable to its **title** to submerged lands, subject only to the rights to regulate interstate and foreign commerce conferred upon the Congress and the admiralty and maritime jurisdiction conferred upon federal

6

courts. Other than those limited grants of regulatory power, no sovereign power over North Carolina's inland waters passed to the United States when North Carolina joined the Union, and no sovereign power came thereby to North Carolina.

## I.    THERE IS NO FEDERAL JURISDICTION OVER THE STATE'S COMPLAINT

### A.  The Standard Of Review Is *De Novo*

The standard of review on challenges to subject matter jurisdiction, including to the propriety of removal jurisdiction under 28 U.S.C. § 1441(a), is *de novo*. *Dixon v. Coburg Dairy*, 369 F.3d 811, 815-16 (4th Cir. 2004) (en banc).  The removing party has the burden to show jurisdiction. *Hoschar v. Appalachian Power Co.*, 739 F.3d 163, 169 (4th Cir. 2014). Because of inherent federalism concerns, jurisdiction under §1441(a) is strictly construed. *Flying Pigs, LLC v. RRAJ Franchising, LLC*, 757 F.3d 177, 181 (4th Cir. 2014); *Snyder v. Citimortgage, Inc.*, 559 Fed. Appx. 241 (4th Cir. 2014). If there is doubt as to jurisdiction, the case should be remanded to state court. *Id.* (citing *Md. Stadium Auth. v. Ellerbe Becket, Inc.*, 407 F.3d 255, 260 (4th Cir. 2005)).

### B.    Removal Jurisdiction Arises Only From The Well-Pleaded Complaint Rule.

In the absence of diversity, whether jurisdiction exists over an action removed from state court is determined under the well-pleaded complaint rule,

which applies both to the original jurisdiction of the district courts as well as to their removal jurisdiction under §1441(a). *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 10 (1983). Under the rule, federal jurisdiction under 28 U.S.C. § 1331 exists only if a cause of action "arises under" the Constitution, laws, or treaties of the United States, as presented on the face of a properly pleaded complaint. *Gully v. First Nat'l Bank*, 299 U.S. 109 (1936).

Under the well-pleaded complaint rule, each party is the master of its own pleading, *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987) (the plaintiff may purposefully avoid federal jurisdiction by exclusive reliance on state law), and if a party chooses to initiate an action relying solely on state law – as here – no federal issue arising from or within the defendant's claims or defenses transforms the complaint into one over which a federal district court has subject matter jurisdiction. *Flying Pigs*, 757 F.3d at 181. The rule requires judicial inquiry into jurisdiction focusing on the plaintiff's statement of its claim, unaided by anticipated defenses. *Id*.

In *Club Comanche, Inc., v. Gov't of the V.I.*, 278 F.3d 250 (3rd Cir. 2002), the court noted that in a quiet title action there is no federal jurisdiction under the well-pleaded complaint rule when it is the **defendant's** claim (or defense) that is based on federal law. Federal issues of interpreting the Convention between the United States and Denmark, interpreting the federal statutes that transferred

8

submerged and public lands from the United States to the Government of the Virgin Islands, and applying the federal common law of submerged lands did not need to be raised in the plaintiff's well-pleaded quiet title complaint, and there was no federal jurisdiction. *Id.* at 259-60.

Here, even in the face of substantial federalism concerns, Alcoa argued that the Court had jurisdiction because Alcoa's claim to title was supported by its contention that the Yadkin was not navigable in 1789 under federal law. Because the federal navigability issue arose solely from Alcoa's position and not from the complaint, the case should be remanded.

## C.   On Its Face The State's Complaint Raises No Issue Of Federal Law.

The Court properly found that no federal issue was present on the face of the State's complaint. JA 94 at 2. Quiet title actions are created by state law. *Snyder*, 559 Fed. Appx. at 242. In bringing its declaratory judgment action to quiet title to the contested portion of the Yadkin, the State relied solely on its declaratory judgment statute, N.C. Gen. Stat. § 1-253, primarily seeking a declaration that the State owns the contested riverbed. JA 35, 10-12. Significantly, the State did not allege or seek a judgment that its ownership of the riverbed was dependent upon federal law in any way. It did not seek an order declaring that the Yadkin is and has always been navigable. The State merely sought to have its title in the riverbed judicially confirmed.

9

### D.     No Substantial Federal Question Is Otherwise Raised By The Complaint.

A limited exception to the well-pleaded complaint rule exists if the plaintiff's claim involves a substantial federal question. The Supreme Court has articulated a four-factor test for determining whether a substantial federal question exists. Under that test, "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 133 S. Ct. 1059, 1065 (2013). Significantly, **all four** of these requirements must be met or there is no jurisdiction. *Grable & Sons Metal Products v. Darue Eng'g & Mfg.*, 545 U.S. 308, 313-14 (2005). There is only a small, special category of cases in which "arising under jurisdiction" lies under this test. *Gunn*, 133 S. Ct. at 1064.

The district court, having correctly determined that the State's complaint exhibited no federal issue on its face, was foreclosed from finding a substantial federal issue necessarily arising from that complaint unless all the *Grable* requirements were met.

The district court erred in finding that it was "necessary" to decide whether the Yadkin was navigable when North Carolina became a sovereign State, mistakenly believing that under the EFD navigability must be decided solely under federal law. JA 94 at 2-4. According to the district court, this "necessity" alone

10

was sufficient to satisfy the well-pleaded complaint rule and make removal of this action proper.   JA 94 at 2.  This decision was erroneous and wholly contrary to Fourth Circuit jurisprudence. The district court's conclusion that federal law controls the title to North Carolina's sovereign riverbeds is historically inaccurate and legally wrong: there was no federal law of navigability in 1776, and the State's claim of title to its navigable rivers did not, and still does not depend on federal law.

### 1)    The Equal Footing Doctrine Provided No Independent Basis For Federal Question Jurisdiction.

The EFD originated in the Northwest Ordinance of 1787, which provided that new states created out of the Northwest Territory were "to share in the Federal councils on an equal footing with the original states." 1 U.S. Stats. 52 (reenacted by the first Congress in 1789).  The EFD is defined as "the principle that a state admitted to the Union after 1789 enters with the same rights, sovereignty, and jurisdiction within its borders as did the original thirteen states."  *Black's Law Dictionary* 576 (8th ed. 2004).  The Supreme Court enunciated the doctrine in *Pollard v. Hagan*, 44 U.S. 212 (1845), a case concerning filled tidelands formerly flooded by Mobile Bay, which the plaintiff claimed under a federal patent. Georgia had ceded the lands that became the State of Alabama to the United States by a deed of cession providing that future states created from that territory would be

admitted pursuant to the Northwest Ordinance, thus on an "equal footing" with Georgia and the other original states. *Id.* at 220-22.

*Hagan* concluded the federal government could not grant Alabama's tidelands to private entities, because the federal government held them in trust for the future state. 44 U.S. at 224.[2] "[T]he title and dominion of the tidewaters and the lands under them are held by the United States for the benefit of the whole people…' in trust for the future States.'" *Shively v. Bowlby*, 152 U.S. 1, 49 (1894). By definition the EFD applies to future states created out of lands held in trust by the United States.

The EFD neither gave the Court jurisdiction, nor required the Court to determine the navigability of the Yadkin under federal law to resolve the State's claim of title. The Court misinterpreted the doctrine's treatment of the later-admitted states as "co-equal sovereigns" with the original states to mean there can be no difference "between the states when deciding questions of navigability for determining riverbed title." JA 94 at 3-4.

Whether North Carolina had title to the Yadkin when it became sovereign in 1776 is not a federal question for several reasons. First, the EFD applies to new states, usually those created out of territories held in trust by the United States; therefore, *PPL,* an equal footing case, has no bearing on the riverbed title of an

---

2  Later cases clarified that the United States could, in certain limited instances, convey its trust lands. *See Shively v. Bowlby*, 152 U.S. 1, 58 (1894).

original state.  *PPL*'s language that "questions of navigability for determining state riverbed title are governed by federal law," 132 S. Ct. at 1227, applies  solely to the "new" equal footing states.

Second, *Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469 (1988) held that the EFD does not upset submerged lands titles in the original states.  *Phillips Petroleum* held that upon entering the Union, newly admitted coastal states "were given ownership over all lands beneath waters subject to the tide's influence," both navigable and non-navigable. *Id.* at 484. The Court made clear that the doctrine did not require retroactive application of that federal law to the original states, so as to "not upset titles in all coastal States," because many had granted away all or portions of their tidelands long ago. *Id.* at 483. The Court cited Virginia, Pennsylvania, Delaware, and Massachusetts as examples of "low water mark" states. *Id.* at 483 n.12.

Third, since the original states became sovereign in 1776 before they created the United States, what titles the original states acquired by conquest from the Crown cannot raise a federal question.  When the original states formed the Union, their own law as individual sovereigns determined what submerged lands they had acquired.  That presents no federal question:

> Because the Federal government never had original jurisdiction over the trust lands and waters of the Thirteen Original States, it never conveyed these lands to any of them.  **Thus, no Federal question arises as to what lands were held in trust by any of the original**

**States when they formed the Union.** This is in contrast to the situation of the 37 new states.

D. Slade, *Putting the Public Trust Doctrine to Work* (1990) ("Slade"), at 18 (emphasis added) (cited with approval on other grounds in *PPL,* 132 S. Ct. at 1235).

Even in the after-admitted states where the EFD operates to determine riverbed ownership between states and the federal government, the Supreme Court has held that doctrine spends its force once that title determination is made, and any later occurring real property issues are the exclusive province of state law. *Oregon, ex rel State Land Board v. Corvallis*, 429 U.S. 363, 371 (1977). The necessary implication of the trial court's theory is that the original states are to be treated inequitably, with **less** dignity than later-admitted EFD states.

The original states differ from the 37 "new" states in other important ways. First, they became sovereign by military conquest, taking title to and dominion over all Crown lands within them. They were not **admitted** into the Union: they **formed** it. Second, they did not cede those lands to the federal government as they did their western lands.[3] When the original states ratified the Constitution and formed the Union, they retained their sovereign submerged lands. Slade, 17-18. Such differences negate any assertion that equal footing means identical title

---

[3] North Carolina's legislature passed an act ceding its western lands in 1789. W. Clark, State Records of N.C., Vol XXV, at 4-6. Congress accepted a deed from the State's two senators on April 2, 1790. 1 Stat. 106 (1790).

14

rights. It is noteworthy that the EFD never treated new states identically to the original states, since the federal government retained ownership of the non-navigable riverbeds in those new states; whereas the original states retained ownership of all their riverbeds.

Indeed, "[w]hat lands and waters were received by each of the 37 new States, in contrast to the thirteen original states, from the Federal Government upon Statehood is singularly a Federal question." Slade, at 19. The federal courts, in a series of cases culminating in *PPL*, fashioned a federal definition of navigable waters for the new states, to determine what submerged lands those states received (navigable) and what the United States retained (non-navigable). These organic differences in the new and original states reveal the true meaning of *PPL*'s language that "questions of navigability for determining state riverbed title are governed by federal law," 132 S. Ct. at 1227. This contextual reading of the PPL language is the only reading that would not disturb centuries of vested land titles in original states. Unfortunately, the district court appears to have been mesmerized by the *PPL* quote without any apparent understanding of its context.

Worse, application of *PPL* would wreak havoc upon submerged land titles in the original states. As early as the 1600's, Virginia and Massachusetts began conveying lands between the high and low water marks to owners on tidewaters, for purposes such as facilitating construction of wharves. Other states made similar

conveyances. *Shively*, 152 U.S. at 18-19, 24-25. Although some original states did not come into the Union with all of their tidelands, new coastal states were nonetheless admitted with a full complement of tidelands under the EFD.  Equal treatment under the EFD does not mean identical treatment.

The district court correctly found that "[w]hen the Revolution took place, the people of each state became themselves sovereign; and in that character hold the absolute right to all their navigable waters and the soils under them." JA 94 at 3 (citing *Martin v. Waddell*, 41 U.S. 367, 410 (1842)).  However, it failed to quote or follow the remainder of that sentence, which reads: "for their own common use, **subject only to the rights since surrendered by the Constitution**." *Id*. (emphasis added).  By ratifying the Constitution, the original states surrendered the right to regulate commerce with foreign nations and among the several states and passed admiralty and maritime jurisdiction to the federal courts. U.S. Const. art. I, sec. 8 and art. III, sec. 2. Nothing in the Constitution (or the Articles of Confederation) made the original states' sovereign title depend on federal law.

### 2) Resolution Of The State's Claim Of Title Did Not "Necessarily Depend" On Federal Law.

A given claim "necessarily depends" on a question of federal law only when every legal theory supporting the claim requires the resolution of a federal issue. *Flying Pigs,* 757 F.3d at 182 (quoting *Dixon*, 369 F.3d at 816).  *See also Pinney v. Nokia, Inc*., 402 F.3d 430, (4th Cir. 2005).  "[I]f the plaintiff can support his claim

16

with even one theory that does not call for an interpretation of federal law, his claim does not 'arise under' federal law for purposes of § 1331." *Dixon*, 369 F.3d at 817.

> [I]f a claim is supported not only by a theory establishing federal subject matter jurisdiction but also by an alternative theory which would not establish such jurisdiction, then federal subject matter jurisdiction does not exist.

*Mulcahey v. Columbia Organic Chems. Co*., 29 F.3d 148, 153 (4th Cir. 1994).

The application of this analysis to this case is straightforward.  Under North Carolina law, the State is not required to prove the navigability of a river in order to prevail against an adverse claimant to a riverbed, even if the opposing party insists that the river is not and was never navigable.  Instead, had this action proceeded in North Carolina courts, the State would have its full statutory presumption apply to **all** its land, including that submerged under both navigable and non-navigable waters.  N.C. Gen. Stat. § 146-79. The burden then would have been on Alcoa to show connected chains of title to valid sovereign grants of riverbed to overcome that presumption. *State v. Brooks*, 279 N.C. 45, 181 S.E.2d 553 (1971). But a connected chain of title alone would not overcome the State's presumption of title to the bed unless accompanied by proof that at that location the river was not navigable, or a grant from the sovereign met the *Gwathmey* requirement.  If Alcoa could not have proven that, the State would have been entitled to judgment as a matter of law, *Brooks*, 279 N.C. at 58, 181 S.E.2d at 560-

17

61.  The navigability, *vel non*, of the Yadkin under State law (or any other law) would never have arisen in the State's case and would have been material only in Alcoa's defense to identify what proof it needed to meet its burden.

Further, if a genuine issue as to any defense had arisen in the litigation, the burden would have been on Alcoa to prove that defense.  *Pearson v. Pearson*, 227 N.C. 31, 40 S.E.2d 477 (1946).  Accordingly, to prevail on a defense Alcoa would have to show the Yadkin was not navigable.  In that regard, unlike current federal law applicable to the newer states (the EFD), a river's navigability under North Carolina law is not determined on a segment by segment basis, at least where it is navigable both upstream and downstream from problematic areas.  In *Broadnax v. Baker*, 94 N.C. 675, 681 (1886), the North Carolina Supreme Court said:

> Navigable waters, constituting highways, are not ascertained here, as they are in England, an island accessible to ocean tides, by the extent of their ebb and flow, but by a more practical test of their capacity to float boats used as instruments of commerce, in the interchange of commodities, and large enough for the purpose. Such waters lose not their navigability, because intercepted by falls, when above and below them, the waters can be thus used for the purpose of commerce for long distance. Under such circumstances, they remain highways for common use. Such is the condition of many of our large rivers.

Of course, if Alcoa were to mount defenses affected by navigability issues, those defensive issues are not considered under the well-pleaded complaint rule. *Flying Pigs*, 757 F.3d at 181 (citing *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 809 (1988)).

18

Because factual questions and legal issues about the historic navigability of the Yadkin need never have arisen in the State's prosecution of this case in state court, there is no federal subject matter jurisdiction under the well-pleaded complaint rule.

### 3) Any Purported Federal Issue Of Navigability Is Not Substantial.

Assuming that federal navigability law was necessarily raised, that alone is insufficient for subject matter jurisdiction. *Grable,* 545 U.S. at 313-14. "[I]t is not enough that the federal issue be significant to the particular parties in the immediate suit; that will always be true when the state claim 'necessarily raise[s]' a disputed federal issue, as *Grable* separately requires. The substantiality inquiry under *Grable* looks instead to the importance of the issue to the federal system as a whole." *Gunn,* 133 S.Ct. at 1066.

In a similar case the 11th Circuit stated:

> Our conclusion that the district court has no jurisdiction of this case comports with the fact that there is no federal interest whatever in the resolution of this controversy. Federal law is appropriately indifferent to Florida's invocation or application of a federal test of navigability as a precondition to determining a question of state law.

*Mobil Oil Corp. v. Coastal Petroleum Co*., 671 F.2d 419, 426 (11th Cir.), *cert. denied*, 459 U.S. 970 (1982).  Unlike *Grable,* in which the Supreme Court determined that providing a federal forum for federal tax litigation was sufficiently substantial to support the exercise of federal-question jurisdiction over a quiet title

19

action removed from state court, here, as in *Mobil Oil*, the federal system is "indifferent" to how North Carolina courts define navigability. However North Carolina courts rule, the law of navigability in no other state will be impacted.

### E. Federalism Concerns Strongly Suggest That Title To Riverbeds In The Original States Should Be Left To Those States Alone.

Because arising-under jurisdiction to hear a state-law claim always raises the possibility of upsetting the federalism balance, the mere presence of a disputed federal issue and the availability of a federal forum are never dispositive of the jurisdictional issue. "[T]here must always be an assessment of any disruptive portent in exercising federal jurisdiction." *Grable*, 545 U.S. at 314.

Surely individual states have greater interest in their internal title disputes than the federal government where, as here, federal title is not at issue. If the state courts in the original thirteen states rule upon the navigability of their states' rivers, their judgments have no broad effects within the federal system, nor would they stand as binding precedent for any future claim to submerged lands under other navigable waters in any other state. Thus, here there is no "serious federal interest in claiming the advantages thought to be inherent in a federal forum." *Grable*, 545 U.S. at 313.

As the Supreme Court recently held, even though Congress established exclusive federal jurisdiction over patent cases, that did not mean a state should be barred from litigating a legal malpractice claim in state court simply because it

20

might require resolution of a hypothetical patent issue. *Gunn*, 133 S. Ct. at 1068. *Gunn* found the state's interest in malpractice litigation superior to federal interest in patent law because of federalism concerns as well as its lack of substantiality. Surely the same should be true of litigation over title to a riverbed claimed by a state, where neither the Constitution, a treaty nor any act of Congress mandates that title claims to riverbeds in the original thirteen states be tried in a federal forum.

State courts are perfectly competent to apply the governing law of navigability should that issue arise. There is no need for federal uniformity in navigability law for cases arising in the original states, because - as heretofore discussed - there is not and never has been any uniformity in the states' laws in that regard. As to federal-state balance, it is doubtful that federal courts generally have any greater familiarity with the vagaries of State navigability law.

**F.    There Is No Genuine Dispute As To The Meaning Of The Constitution Or Any Act Of Congress.**

Merely being able to articulate a question of whether federal law could theoretically apply is not enough to establish federal question jurisdiction. As the Supreme Court has noted, a title claim derived from or based upon federal law does not necessarily give rise to jurisdiction:

> A suit to enforce a right which takes its origin in the laws of the United States is not necessarily, or for that reason alone, one arising under those laws, for a suit does not so arise unless it really and

21

> substantially involves a dispute or controversy respecting the validity, construction or effect of such a law, upon the determination of which the result depends. This is especially so of a suit involving rights to land acquired under a law of the United States. If it were not, every suit to establish title to land in the central and western States would so arise, as all titles in those States are traceable back to those laws.

*Shulthis v. McDougal*, 225 U.S. 561, 569-70 (1912).

In *Shulthis* the Court found that there was no federal-question jurisdiction to hear a quiet title claim, in part because the federal statutes on which title depended were not subject to "any controversy respecting their validity, construction, or effect." *Id.* at 570. Here, there is no real issue over the validity, construction or effect of any provision of the Constitution, any treaty or any act of Congress. That the original states retained their land and water titles when forming the United States is not disputed. No treaty has been called into question. No statute has been alleged to be invalid. There is no actual dispute over any federal law here.

## II.    THE DISTRICT COURT ERRED BY GRANTING ALCOA'S SECOND MOTION FOR SUMMARY JUDGMENT APPLYING THE NORTH CAROLINA MARKETABLE TITLE ACT.

### A.    Standard Of Review.

On appeal, the trial court's ruling on a motion for summary judgment is reviewed de novo. *Mereish v. Walker*, 359 F.3d 330, 334 (4th Cir. 2004).

### B.    The North Carolina Marketable Title Act Does Not Apply To Riverbeds Which The State Acquired From The British Crown By Virtue Of Sovereignty.

Having ruled that the portion of the Yadkin in question was non-navigable under its interpretation of federal law, the Court paid no heed to the character of the land in dispute in allowing Alcoa's motion for summary judgment on the MTA N.C. Gen. § 47B-1 *et seq*. JA 1899 at 4. The property at issue is not land acquired by the State through *mesne* conveyance, rather it is land submerged beneath the public trust waters of one of North Carolina's largest rivers, title to which is vested in the State as an incident of sovereignty. *State ex rel. Rohrer v. Credle (Credle)*, 322 N.C. 522, 525, 369 S.E.2d 825, 827 (1988) (citing *Martin v. Waddell's Lessee*, 41 U.S. 367 (1842)). S*ee Gwathmey*, 342 N.C. at 293, 464 S.E.2d at 677 (the public trust doctrine looms over any discussion of the ownership of submerged lands); *See generally Bauman v. Woodlake Partners, LLC*, 199 N.C. App. 441, 451, 681 S.E.2d 819, 826 (2009) (The placement of a dam across an otherwise navigable stream does not render that stream non-navigable, because if such a rule were adopted "many of the major rivers in North Carolina, such as the Catawba and the Yadkin, would become non-navigable, which would be a troubling result.")

The State's sovereign title to the bed of the Yadkin is not the sort of title defect which the MTA intended to clear:

> . . . such marketable record title shall be free and clear of all rights, estates, interests, claims or charges whatsoever, the existence of which depends **upon any act, title transaction, event or omission that occurred prior to such 30-year period**. All such rights, estates,

> interests, claims or charges, however denominated, whether such rights, estates, interests, claims or charges are or appear to be held or asserted by a person sui juris or under a disability, whether such person is natural or corporate, or is private or  governmental, are hereby declared to be null and void.

N.C. Gen. Stat. § 47B-2(c) (2015) (emphasis added). The Legislature could not have intended for the MTA to apply to the State in a case such as this, where its title to the bed of the Yadkin does not arise from "any act, title transaction, event or omission" cognizable under the statute.  The only "act" or "event" vesting the State with title is its appropriation of the riverbed from the Crown upon the Declaration of Independence. North Carolina courts have held that rights so acquired are attributes of sovereignty, not "claims of title in land" in a conventional sense.  For example, the State's assertion of public trust rights in the State's ocean beaches is not a "claim of title in land" for purposes of an action to quiet title.  *Fabrikant v. Currituck County*, 174 N.C. App. 30, 42, 621S.E.2d 19, 27-28 (2005).

The Legislature could not have intended the MTA to perfect private titles to riverbeds never subject to entry and grant, as it lacks the requisite express and specific words evidencing unambiguous intent to divest those rights. *Gwathmey*, 342 N.C. at 304, 464 S.E.2d at 684. *See Kraft v. Town of Mt. Olive*, 183 N.C. App 415, 422, 645 S.E.2d 132, 138 (2007) (nothing in the MTA "would allow the rights of the public to a dedicated right-of-way to be abolished"). Given that the

Legislature has long sought to protect the rights of the public in public trust lands, North Carolina and federal courts have been loath to interpret the law in a manner that would restrict public trust rights. This Court, in *Swan Island Club, Inc.*, 209 F.2d at 701, recognized that the Legislature would not have intended for the Torrens Act to vest title to land under navigable water. Similarly, applying the MTA to divest the State of title to the bed of the Yadkin contradicts public policy. *See* N.C. Gen. Stat. §§ 1-45.1, 76-40, 113-131, 113-205 and 206; 146-3(1) and 64(7); *Credle*, 322 N.C. at 525-27, 369 S.E.2d at 826-29; *Ward v. Willis*, 51 N.C. at 185-86; *Tatum v. Sawyer*, 9 N.C. at 229.

Similarly, in *Coastal Petroleum Co. v. American Cyanamid Co.*, the Florida Supreme Court considered that state's Marketable Record Title Act (MRTA), determining "that the legislature did not intend to make MRTA applicable to sovereignty lands" 492 So.2d 339, 344 (1986). The Florida Supreme Court reasoned that the Florida legislature understood the well-established law that title to lands submerged beneath public trust waters did not pass to private interests when those lands were included in a conveyance. *Id.* The court was persuaded that had the legislature intended for MRTA to apply to sovereign lands it would have made special reference to those lands in the act. *Id.* In considering North Carolina's MTA, the same interpretation controls because the public's interest in preserving public trust lands "outweighs the State's interest in promoting the

25

alienability and marketability of the land." M. Kalo & J. Kalo, *The Battle to Preserve North Carolina's Estuarine Marshes*, 64 N.C.L. Rev. 565, 603 (1986).

Prior to its ruling on the MTA, the court applied N.C. Gen. Stat. § 146-79 to grant the State summary judgment on its *prima facie* case of ownership of the disputed riverbed. JA 220 at 8. To rebut the State's presumption under N.C. Gen. Stat. § 146-79, a claimant is required to show "a connected chain of title from the sovereign to [it] for the identical lands claimed by [it]" *Brooks*, 279 N.C. at 50, 181 S.E.2d at 556 (quoting *Sledge v. Miller*, 249 N.C. 447, 451, 106 S.E.2d 868, 872 (1959)). This requirement is consistent with traditional methods of establishing *prima facie* ownership long recognized by North Carolina courts. *Mobley v. Griffin*, 104 N.C. 112, 115, 10 S.E. 142, 142-43 (1889).

The court relied in part on the MTA definition of a "person" as "private or governmental, including the State and any political subdivision or agency thereof." JA 1899 at 6; N.C. Gen. Stat. § 47B-8(1) (2015). The district court misconstrued *Taylor v. Johnston*, 289 N.C. 690, 224 S.E.2d 567 (1976), the seminal North Carolina MTA case where the State was a party. The *Taylor* Court emphasized that the MTA has no effect on the State's presumption of title under N.C. Gen. Stat. § 146-79, and that court actually refused to apply the MTA against the State. *Taylor* at 711-12, 224 S.E.2d at 579-80 ("Neither does the act affect the provisions

26

of G.S. 146-79."); P. Hetrick and J. McLaughlin, Jr., *Webster's Real Estate Law in North Carolina* § 25.02 n.17 (6th Ed. 2011).

The *Taylor* Court reasoned that the presumption of title in the State under N.C. Gen. Stat. § 146-79 was intended to avoid the undesirable and chaotic result of land titles being in limbo. 289 N.C. at 712, 224 S.E.2d at 580 (citing *Brooks*, 279 N.C. at 57, 181 S.E.2d at 560). The district court's ruling leads to that chaotic result. It applied the MTA not to cure some ancient technical defect, but rather to divest the State of submerged lands it acquired upon independence. When it is unclear whether the MTA or a traditional rule of law should prevail, the interpretation "that harmonizes the Act with traditional law should be adopted, especially where vested estates in land (as opposed to ancient technical defects) would be extinguished by operation of the Act." *Webster's* at § 25.02.

The Court improperly decided this weighty question of state law, the application of the MTA to divest sovereign riverbeds, without guidance from a North Carolina court. *Nature Conservancy v. Machipongo Club, Inc.*, 579 F.2d 873, 875-86 (4th Cir. 1978) ("the issue of the ownership of the beaches and meadow and marshlands raises fundamental questions of public policy that should be resolved in the first instance by the state courts."); *Town of Nags Head v. Toloczko*, 728 F.3d 391, 397 (4th Cir. 2013) (it would "obviously offend

federalism and comity for a federal court to physically delimit the metes and bounds of a state's sovereign lands").

**C.    An 1885 Session Law Declaring The Yadkin A Public Highway Prevent Title To The Bed Of The Yadkin From Being Vested In Alcoa Under The MTA.**

In 1885 the Legislature ratified "An Act to Declare the Great Pee Dee and Yadkin Rivers Public Highways, and for Other Purposes." N.C. Pub. Law (1885), ch. 212 ("1885 Act" or "the Act"). JA 139. Section 1 of the Act provides:

> That the Yadkin river from the northern boundary line of the county of Davidson to its junction with the Great Pee Dee river, and the Great Pee Dee from said junction to the boundary line of the State of South Carolina, be and the same are hereby declared public highways for the free passage of boats, flats, rafts and other means of transportation.

The Act encompasses the entire disputed portion of the Yadkin. On its face, the Act is declaratory in nature; the Yadkin and other watercourses of significance have long been understood to be public highways. JA 108 at 6-7; JA 118; JA 132; JA 519; JA 522, JA 524; JA 529. But even if it is viewed as only operating prospectively, the purported disposition of any portion of the contested riverbed by entry and grant manifestly occurred after passage of the Act and must be void. *Swan Island Club, Inc.*, 114 F. Supp. at 100.

A North Carolina court so construed the 1885 Act in *Carolina Sand v. Northbrook Carolina Hydro*, 2002 WL 34146903 (N.C. Super. Forsyth County) JA 134, finding that common law and the Act required the portion of the Yadkin at

28

issue there (upstream from the disputed riverbed) "was public trust property held by the State of North Carolina for the use and benefit of the people of the state" and therefore could not be granted under the general laws then in effect: N.C. Code (1883), § 2751. *Carolina Sands,* 2002 WL 34146903*,* at 6-7; *Gwathmey*, 342 N.C. at 304, 464 S.E.2d at 684.

### D.    Even If The MTA Applied, There Is A Genuine Dispute Of Material Fact As To The True Boundaries Of The Historic Bed Of The Yadkin River Claimed By Alcoa.

The district court's unprecedented application of the MTA in this case extinguished the State's vested title in the riverbed, without making Alcoa show the bounds of the riverbed tracts it claims as required under N.C. Gen. Stat. § 146-79. *Brooks*, 279 N.C. at 57, 181 S.E.2d at 560 ("title to the lands in controversy shall be taken to be in the State *unless* and *until* the other party shall show that he has a good and valid title to such lands *in himself*" (emphasis in original)). The evidence proffered by Alcoa's own title experts clearly shows that many of its chains of title do not include the riverbed in their source grants from the State.  JA 1830, JA 1839 - 1858. Unable to prove its title in accordance with long-established North Carolina law, Alcoa attempted to employ the MTA.

The district court properly recognized that "the connected chain of title inquiry is an extraordinarily fact-intensive one, involving thousands of documents, hundreds of properties, and decades of history." JA 220 at 9.   Yet,  at  the

conclusion of the trial on navigability, the court commented regarding the vast

quantity of title documents still subject to evidentiary review:

> [I] mean, to be quite obvious, you've seen me here for two days. If
> you think I'm going to be sitting here for two years going through title
> instruments, I would rather be off this earth than do that. That's not
> going to happen.

JA 492 at 360. By granting Alcoa summary judgment on the MTA, the district

court avoided the laborious process of examining numerous chains of title, but

failed to establish the true bounds of the riverbed, relying instead on the written

and un-cross-examined opinions of Alcoa's title and surveying experts. JA 1899 at

5 and 7. A genuine issue of disputed material fact remains, whether the record

instruments through which Alcoa claims title actually describe the various tracts

within the 45-mile portion of the riverbed at issue.

### E. Even If The MTA Did Apply, There Are Genuine Disputes Of Material Fact As To Alcoa's Actual Possession Of The Claimed Portion Of The Historic Bed Of The Yadkin River Under Known And Visible Boundaries.

Assuming the MTA does apply, the following exception listed in N.C. Gen.

Stat. § 47B-3(3) defeats Alcoa's reliance on the Act: "[r]ights, estates, interests,

claims or charges of any person who is in present, actual and open possession of

the real property so long as such person is in such possession." The State typically

does not exercise possession in public trust waters such as the Yadkin by excluding

the public from those waters. Instead, the State's "present, actual and open

possession" is evidenced by safeguarding public trust waters for the use and benefit of the public.  *See, e.g.,* N.C. Gen. Stat. §§ 113-131, and 1-45.1 (2015). The State's exercise of its regulatory powers over fisheries, boating safety, navigation and water quality are also compelling indicia of actual possession.  As a rule,

> in determining what will amount to actual possession of land, considerable importance must be attached to its nature, character, and locality, and to the uses to which it can be applied, or to which the claimant may choose to apply it. The possession is not required to be more full than the character of the land admits.

*Taylor,* 289 N.C. at 711, 224 S.E.2d at 579.

In determining that the open possession exception to the MTA does not apply, the district court opined that the State conceded, "that its interest in the bed of the Relevant Segment is 'presently non-possessory.' JA 1899 at 6. Any fair reading shows the State only referred to its **vested**, presently non-possessory, interest **in the four dams**, located over a small portion of the riverbed, not referring to the entire 45-mile stretch of the river.  The State actually maintained (even prior to Alcoa asserting the affirmative defense of the MTA) that in its declaratory judgment action it sought to "have recognized **its vested, though presently non-possessory, interest in those portions of the dams** . . . located over the historic bed of the Yadkin River." JA 154 at 3 (emphasis added). S*ee* JA

31

1798 at 8, JA 1914 at 32-33. The district court erred by basing its ruling in part on a pleading the State never made.

The district court also erred in determining that the exercise of regulatory authority by North Carolina Wildlife Resources Commission ("WRC") does not satisfy the open possession exception of the MTA. JA 1899 at 6-7; N.C. Gen. Stat. § 47B-3(3) (2015). The WRC exercises stewardship authority over the public trust waters covering the impounded riverbed and the adjacent reservoir pursuant to N.C. Gen. Stat. § 113-131. The manner in which the State possesses the land at issue is necessarily conditioned by the character and nature of that land. The State has been in open possession of the Yadkin through the exercise of its regulatory authority for centuries (the exercise of such authority actually predating the formation of the State with the extension of Royal influence over the backcountry of the Colony of North Carolina in the mid-eighteenth century).

## III. THE DISTRICT COURT ERRED BY GRANTING APPELLEE'S SECOND MOTION FOR SUMMARY JUDGMENT ON ADVERSE POSSESSION.

### A. Standard Of Review.

On appeal, the trial court's ruling on a motion for summary judgment is reviewed *de novo*. *Mereish v. Walker*, 359 F.3d 330, 334 (4th Cir. 2004).

### B. Submerged Lands Subject To Public Trust Rights Cannot Be Acquired By Adverse Possession.

As a matter of law, it was error for the Court to enter judgment for Alcoa on the ground of adverse possession, because title to real property subject to public trust rights may not be acquired by adverse possession in North Carolina. N.C. Gen. Stat. § 1-45.1. Although Alcoa has argued that this 1985 statute may not be applied retroactively, this statute codified the State's common law regarding public trust rights, *Fish House, Inc. v. Clarke*, 204 N.C. App. 130, 133, 693 S.E.2d 208, 210 (2010), and is consistent with the State's longstanding protection against alienation of its submerged lands.

Title to submerged lands could never be conveyed by entry and grant, but only by special legislative act, precisely because of the inherent public trust rights. The North Carolina Supreme Court has stated:

> This Court has long recognized that after the Revolutionary War, the State became the owner of lands beneath navigable waters but that the General Assembly has the power to dispose of such lands if it does so expressly by special grant. *E.g.*, *Shepard's Point Land Co. v. Atlantic Hotel*, 132 N.C. 517, 524, 44 S.E. 39, 41 (1903).

*Gwathmey*, 342 N.C. at 293, 464 S.E.2d at 677. Whether public trust rights apply is determined based upon navigability of the waters above submerged lands:

> if a body of water in its natural condition can be navigated by watercraft, it is navigable in fact and, therefore, navigable in law, even if it has not been used for such purpose. Lands lying beneath such waters that are navigable in law are the subject of the public trust doctrine.

*Gwathmey*, 342 N.C. at 301, 464 S.E.2d at 682.

33

As argued in Section IV of this brief, the State presented plenary evidence at the hearing on navigability to create at least a genuine issue of material fact that the Yadkin at the time of statehood was actually used for navigation by watercraft, for recreation and commerce. The historical evidence demonstrates that the Yadkin easily meets North Carolina's "navigable in fact" test. The 1885 Act is further evidence of navigability of the Yadkin because it declares the Yadkin to be a "public highway" and allows counties along the river to require landowners to remove any obstructions to navigation. 1885 N.C. Sess. Laws, c. 212 (DE 62-7). The 1885 Act intended to protect the public's right to navigate the Yadkin, clearly indicating that it was considered navigable and subject to public trust rights.

Accordingly, the lands beneath the historic riverbed of the Yadkin are subject to public trust rights and cannot be aliened except by special legislative act, whether by legislative grant expressly conveying such lands or by legislative enactment expressly authorizing that such lands may be otherwise aliened, such as by adverse possession against the State. Neither of these circumstances has been shown in this case.

The Court initially adopted the State's argument pertaining to N.C. Gen. Stat. § 1-45.1, recognizing in its initial summary judgment order that "title to real property held by the State which is subject to public trust rights, including navigable waterways, may not be acquired by adverse possession." JA 220.

34

Ultimately, on rejecting the State's argument and reversing the burden of proof on title, the district court stated:

> The State argues that the Relevant Segment may not be acquired by adverse possession because it is subject to public trust rights. N.C. Gen Stat. § 1-45.1. That is only true, however, where "title to real property is held by the State." *Id.* The prohibition cannot apply where, as here, the State has not demonstrated that it has title to the real property at issue. . .  Here the State has never proven that it has valid title . . . but instead argues that because Alcoa's title is invalid, title defaults to the State.

JA 1899 at 8.

North Carolina owned the Yadkin riverbed at statehood. In its earlier summary judgment ruling, the district court determined that the State had established its *prima facie* case of ownership of the riverbed, citing N.C. Gen. Stat. § 146-79.  JA 220 at 8. From statehood forward, N.C. Gen. Stat. § 146-3(1) or its predecessors has prohibited conveyance of fee title in lands submerged beneath waters navigable in fact, except by special legislative grant expressly conveying such submerged lands free of public trust rights. *Gwathmey*, 342 N.C. at 304, 464 S.E. 2d at 484.  The only way Alcoa can show that the State has divested itself of title to the historic riverbed of the Yadkin is by demonstration of the existence of express legislative grant or grants expressly conveying the same, which it has not done.

**C.    The Trial Court Erred In Entering Summary Judgment In Favor Of Alcoa On The Basis Of Adverse Possession Because Genuine**

**Disputes Of Material Fact Exist Pertaining To Adverse Possession.**

Under North Carolina common law, to acquire title by adverse possession the claimant must show all of the following: actual, exclusive, open and notorious possession, identifiable by known and visible boundaries, that is hostile to the rights of the true owner. *Locklear v. Savage*, 159 N.C. 236, 74 S.E. 2d 347 (1912). If a material fact issue exists as to any of the required factors, summary judgment is inappropriate.

Alcoa's use of the submerged bed of the Yadkin has never been hostile or adverse to the State's ownership interest. Possession initiated with permission cannot become adverse unless and until the adverse claimant **disavows** permissive use and **ousts** the owner by making a claim of right as the absolute owner. *Wilson County Bd. Educ. v. Lamm*, 276 N.C. 487, 173 S.E.2d 281 (1970). Before construction of the dams the Legislature incorporated a number of power companies that are either predecessors in Alcoa's chain of title or direct corporate predecessors of Alcoa and authorized those companies to acquire private land and the unallocated land of the State for the location, construction and operation of dams for the generation of hydroelectric power. For example, in *An Act to Incorporate the Tallassee Power Company* (1905 N.C. Sess. Law 122) (JA 146), the legislature created Tallassee Power Company and authorized it to locate, build

36

and operate hydroelectric dams on rivers within this State. Permission of this nature negates hostile use and possession.

If this or other similar acts authorized any predecessor of Alcoa to locate and operate dams on the Yadkin, Alcoa cannot meet its burden on summary judgment as to adverse possession, and the State is entitled to judgment as a matter of law **unless** Alcoa can show ouster by direct, unequivocal notice to the State that Alcoa rejected permissive use and occupies the subject property by claim of right.

As evidence of disavowal and ouster, Alcoa points to the State's participation in prior Federal Power Commission ("FPC") proceedings with Alcoa or its predecessors. The State's participation in these proceedings do not constitute ouster. Alcoa, joined by the State, contested the jurisdiction of the FPC, arguing that the river was not navigable under Federal Commerce Clause analysis. While there were broad, general statements by both parties pertaining to Alcoa's ownership of the lands and flood rights "necessary for the dam project," these statements were not specific enough to constitute a disavowal of the State's ownership of the riverbed. Furthermore, because title to these lands was not an issue in these proceedings, any putative title claims by Alcoa were not subject to close scrutiny by the parties or by the FPC.

This is what Alcoa said in Exhibit E to its 1957 application to the FPC:

Applicant heretofore has acquired and now owns title to all the land and **appurtenant water rights** for the existing High Rock, Narrows

37

and Falls Developments and has acquired and now holds title to approximately 60 percent of the land and water rights for the proposed Tuckertown Development.

JA 1738 (emphasis added).  Alcoa's 2006 license application to FERC states the following:

North Carolina follows the riparian system of water rights, whereby the owner of riparian land possesses the right to use the waters passing over its lands reasonably, including temporarily impounding the water through the erection of a dam. See, e.g., *Dunlap v. Carolina Power & Light Co.*, 212 N.C. 814, 823 (N.C. 1938) APGI owns all of the lands and **riparian rights** necessary under North Carolina law to operate and maintain the developments of the Yadkin Project**.**

JA 1369 (emphasis added).  These broad, generalized statements are insufficient to establish ouster by Alcoa. Instead, both statements admit that riparian rights, not ownership of the historic riverbed, are the source of Alcoa's right to build its dams and impound the waters of the Yadkin. "All of the lands and riparian rights necessary" for Alcoa's Yadkin Project may be obtained merely by acquiring fee title to property adjacent to the river at the location of the dams and acquiring flooding rights to the uplands, without owning any of the riverbed in fee, particularly where the riverbed is occupied by permission.

North Carolina's participation in the FPC proceedings is actually evidence of **permissive use**. Until Alcoa closed the smelting plant at Badin, the State regarded Alcoa's use as beneficial. JA 143. The State's land management agency, the Department of Administration, had no reason to know that Alcoa claimed ownership of the historic riverbed until one of Alcoa's employees asserted their

38

claim at a legislative committee meeting on June 10, 2013. JA 100. This lawsuit was filed within sixty days of that committee meeting.

Alcoa proffers various permits, licenses or rights-of-way conveyed to State agencies as evidence that the State had notice of Alcoa's claim to the riverbed. *See* JA 1461; JA 1501; JA 1515; JA 1516; JA 1526; JA 1533, among others. These pertain to access areas and game lands adjacent to the reservoirs and do not implicate title to the riverbed. Rights-of-way cited by Alcoa which cross the riverbed for highway bridge construction and maintenance extend from uplands outside the reservoir on one side of the river to uplands outside the reservoir on the other side of the river and do not contain language specifying a right to go over or upon the riverbed. No description of the historic riverbed was necessary since the State held title to it. The grantee in these instruments, the North Carolina Department of Transportation (or its predecessors), is an agency independently authorized to acquire land or necessary easements, permits, licenses and rights-of-way for highway projects, and its actions are in no sense recognition by the State of riverbed ownership by Alcoa.

Lastly, a material fact issue exists as to whether Alcoa has shown exclusive use and possession of the submerged riverbed over known and identifiable boundaries. The historic bed of the Yadkin is submerged beneath waters impounded by Alcoa's dams. Natural monuments such as trees and large rocks are

unavailable to mark the boundaries of the former riverbed. When natural monuments are unavailable, it is incumbent upon the adverse claimant to show placement and maintenance of artificial monuments or markers to establish that possession is maintained over known and visible boundaries. Kalo, 64 N.C.L. Rev. at 603 (citing *McDaris v. Breit Bar "T" Corp.*, 265 N.C. 298, 303, 144 S.E.2d 59, 63 (1965)).

Although Alcoa has placed no trespassing and other signs near the dams or on the banks of the reservoirs, far beyond the historic riverbed, no markers or monuments exist to identify the boundaries of the former riverbed, which is otherwise unidentifiable by the usual and customary methods. The reservoirs within the contested riverbed are used by the general public for recreational boating, fishing and other purposes, subject only to certain safety and trespass warnings posted by defendant in the general vicinity of the physical structure of the dams. Other than those safety and trespass warnings around the dams, and general boating, safety, fishing and hunting regulations, the general public has unfettered use of these reservoirs, including the portions lying over the historic riverbed. The reservoirs, including the portions lying over the historic riverbed, are patrolled by the Wildlife officers. JA 1424; JA 1429; JA 1443.

## IV.    THE DISTRICT COURT'S FINDINGS OF FACT AS TO NAVIGABILITY ARE NOT SUPPORTED BY THE EVIDENCE AND ARE CLEARLY ERRONEOUS.

## A.    Standard Of Review.

In a bench trial, "[o]n appeal, we review the district court's factual findings for clear error." *United States v. Hall*, 664 F.3d 456, 462 (4th Cir. 2012); U.S. Fed. R. Civ P. 52(6) (2015). "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id*, 664 F.3d at 462  (internal quotation marks and citations omitted); *United States v. Watson*, 793 F.3d 416 (4th Cir. 2015).

## B.    The District Court Erred In Finding That "The Parties Stipulated That The Relevant Segment For The Purposes Of Navigability Is The 45-River-Mile Segment Of The Historic Riverbed." (DE 177 at 2, 7)

The parties only stipulated that the "Relevant Segment of the Yadkin River is the approximately 45-river-mile segment of the historic riverbed now within the Yadkin Hydroelectric Project, Federal Energy Regulatory Commission ("FERC") Project Number P-2197 ("Yadkin Project"), plus 100 yards upstream and downstream." JA 233.  The parties did not stipulate that it was "for the purposes of navigability" as the Court found and subsequently misused in its Conclusion of Law. Because this suit sought only a declaratory judgment on title, it was necessary for the State to identify the land in dispute in its complaint.  The term "Relevant Segment" first used in the Complaint was simply a short hand means of

41

referring to the *locus in quo*, the portion of the riverbed outside of the defined area not being "relevant" to the case.

The State's complaint was never based on federal law as none of the riverbed ever belonged to the United States. At no point in this lawsuit has the State alleged, conceded or stipulated that it is governed by the EFD or other federal law, so its own definition of "Relevant Segment" cannot be interpreted as a stipulation for purposes of applying the EFD.

### C. The Trial Court's Finding That "[T]he Historical Record Of Use For Navigating The Relevant Segment Is Minimal" Is Clearly Erroneous. (JA 268 at 5)

The State's evidence shows that in 1796 Richmond Pearson navigated the whole of Yadkin and Peedee Rivers from Wilkesborough (far upstream of the stretch in dispute) to Georgetown South Carolina, portaging only around the Narrows and Falls. JA 758. The historical record also shows that Pearson and his son Jesse "had a business in the period from 1796 up until 1815 or thereabouts and perhaps beyond that date of carrying on trade and commerce by navigation on the Yadkin River with a portage around the Narrows." JA 278 at 56; JA 715 at 8; JA 743 at 5-6; JA 604 at 2; JA 537 at 19. Richmond Pearson was "a successful merchant and enterprising planter." JA 604 at 2. "He effected the navigation of the Yadkin, from his mills, on South Yadkin, to the narrows, and from thence, by land, below Grassy Islands, thence, by water, to Sneedsboro, which was then a rival to

42

Cheraw." JA 604 at 2. Pearson owned a store in Sneedsboro, which was founded just north of the South Carolina border in 1790. JA 715 at 8.

> The Pearsons set up a portage system to conquer the problem [of the Narrows]. Produce brought down the river on barges were unloaded, put on wagons, carried around overland and reloaded to go downstream the rest of the trip. Jesse spent time going to Cheraw, Georgetown and even Charleston working on details of the business…

JA 715 at 8. After serving in the War of 1812, Jesse Pearson went into partnership with one of his army compatriots, Alexander Nesbitt, in Mocksville in present day Davie County. JA 743 at 21. "Many of the supplies which made A. Nesbit and Company a thriving enterprise came from Charleston and Georgetown by boat to Cheraw and Sneedsborough and on up the Yadkin." JA 743 at 21

The record also contains the first person account of Spruce Macay submitted to the Legislature's Committee on Inland Navigation in 1796. Macay was a prominent resident of Rowan County and served as a Superior Court Judge, the highest court in North Carolina at that time. Judge Macay's "Observations made on the Yadkin River, 15th & 16 June, 1796" provides a concise, detailed survey of an approximately 40 mile stretch of the Yadkin "from Wm. Long's ferry to Wm. Forrests" in which he documents the depth of the river at various spots, the location of man-made obstructions and the position of shoals. At the end of his report, Judge Macay noted that "3 hands have carried 6 hogsheads of tobacco in one day[,] it will[sic] required 27 days to return." JA 761. The contested riverbed

is almost entirely within the area surveyed by Judge Macay (Longs Ferry is located on the Yadkin northeast of Salisbury and Forrests is located approximately 2 ½ miles upstream of the head of the Narrows).  JA 532; JA 278 at 32, 51, 53; JA 1292 at 9, JA 516, JA 518.  Henry Deberry in his report to the Legislature in 1796 concerning inland navigation in Montgomery County, where he resided, stated that the Yadkin above the Narrows "[h]as been Navigated by Boats."  JA 757.

Macay, Pearson and Deberry were appointed by the Legislature to investigate and report on the navigability of specified portions of the Yadkin.  All three were esteemed local citizens and that the Legislature believed their reports is evident by its actions. In 1796, the Legislature passed acts to reconstitute the Yadkin Company (originally chartered by the General Assembly in 1793) for the purpose of working and clearing out the Yadkin north of Forrests in the same manner as public roads and to form the Yadkin Canal Company for the purpose of bypassing the Narrows.  JA 278 at 23-50; JA 519, JA 522, JA 524, JA 529.

In 1816, a Grand Jury in Wilkes County (located far upstream of the disputed riverbed) petitioned the Legislature to make improvements to transportation so that residents could get their goods to market.  The citizens of Wilkes County cited the benefits "experienced by the people of Virginia and some of the Northern States by the improvement of their inland navigation" and lamented the "backwardness" of North Carolina in improving its own rivers.  The

petitioners commented that they "believe it to be a fact that several hogsheads of Tobacco were loaded on a Boat within one mile of Wilkes Court House and were carried from thence to the City of New York with only 7 miles land carriage round the narrows of the Yadkin, and that this is known to some of your Honorable body." JA 764; JA 278 at 71-73. The petitioners added that "[i]f this can be done without any efforts to improve the navigation of the said river, surely we have every imaginable encouragement towards opening and improving its navigation." JA 764.

At trial, Alcoa's expert Mark Newell conceded that canoes were indeed "ubiquitous" on the Yadkin. JA 278 at 212. He testified they were used by Indians and by settlers for travel and for the transport of hides and other things. JA 278 at 203. Nonetheless, Newell asserted this was not commercial use, agreeing with the court's declaration during trial that the Indians did not have "commerce", but instead were simply "barterers." JA 278 at 203. This is nonsense. "Barter, the direct exchange of goods or services - without an intervening medium of exchange or money . . . is considered the oldest form of commerce." 2016 Encyclopædia Britannica, Inc., http://www.britannica.com/topic/barter-trade.

The use of the river by American Indians and the historical accounts of commercial traffic extending over two decades immediately following statehood are hardly minimal in nature. In any case:

45

> **The extent of existing commerce is not the test**. The evidence of the actual use of streams, and especially of extensive and continued use for commercial purposes, may be most persuasive, but where conditions of exploration and settlement explain the infrequency or limited nature of such use, the susceptibility to use as a highway of commerce may still be satisfactorily proved.

*United States v. Utah,* 283 U.S. 64, 82 (1931) (emphasis added).

The court's finding conflicts with the reports of Pearson, Macay and Deberry, as well as the historical accounts of Wheeler, JA 604, Rumple, JA 537, and Hairston, JA 715 and 743. It is clearly erroneous.

> **D.    The District Court's Finding Of Fact That Lt. General Nathanael Greene Loaded His Boats On Wheels Because He "Was Unable To Navigate The Relevant Segment" Is Clearly Erroneous. (JA 268 at 5)**

During the Revolutionary War, General Greene noted the large presence of canoes and the skill of local canoe makers along North Carolina's rivers. Greene recruited these boat builders to construct up to 100 large boats, including bateaux, for troop and supply transport. JA 575 at 2, 4, 5, 7, 10. Greene was specifically interested in using them to transport supplies coming from Virginia down the Dan and the Yadkin to his army. JA 575 at 2, 5. The evidence shows that Greene expressly directed his boats be built with wheels so that they could always move with the army and the progress of the campaign indeed soon took both armies away from the Yadkin. JA 588 at 8, JA 2778 at 103, 105. Thus, the placement of the boats on wheels had nothing to do with the navigable condition of the Yadkin,

but rather was part of Greene's effort to maximize the tactical advantage of mobility enjoyed by the American forces.

## V. THE DISTRICT COURT'S CONCLUSIONS OF LAW AS TO NAVIGABILITY ARE AFFECTED BY ERRORS OF LAW.

### A. Standard Of Review.

"On appeal, we review the district court's . . . legal conclusions de novo." . *Hall*, 664 F.3d at 462.

### B. The District Court Erred As A Matter Of Law In Concluding That Portages Of The Falls And The Narrows Necessarily Defeated A Finding Of Navigability Of The Entire Section Of The River At Issue. (JA 268 at 7, 9)

Over the State's objections, the trial court ruled that it would apply the EFD as enunciated by *PPL* to determine navigability rather than the State's *Broadnax* test. The court then misapplied that law, finding that portages around the Narrows and Falls necessarily defeated a finding of navigability not only as to the Narrows and Falls, but as to the entire stretch of the disputed riverbed. *PPL* and *Utah* hold that the navigability of the portion of a river at issue must be assessed according to the navigability or non-navigability of each segment.

Under *PPL*, the Supreme Court found that necessary portages defeat navigability, but only as to those segments that actually require portaging, not other portions of the river at issue shown by the evidence to be navigable in fact. *PPL*, 132 S. Ct. at 1229, (citations omitted.) In *PPL* the Court found that it was

47

important to determine "the exact point at which navigability may be deemed to end." *PPL*, 132 S. Ct. at 1229 (quoting *Utah*, 283 U.S. at 90).

In this case, rather than determining "the exact point at which navigability may be deemed to end," the Court concluded that because the evidence shows that the Narrows and Falls were portaged for commercial purposes, then the whole disputed area must be declared non-navigable despite undisputed historical evidence to the contrary. JA 268 at 7. The prejudicial significance of this error is made plain by the following passage at the close of the court's conclusions:

> Most persuasive to the Court, however, is the fact that the State conceded that the Narrows and Falls were always portaged. **Even if Pearson did use the Relevant Segment for navigation, there is no evidence to suggest that he navigated it in its entirety. . . . The Relevant Segment above and below the Narrows might very well have been navigable at statehood.** The State certainly presented some historical evidence of navigability, and the geomorphology and historical evidence demonstrate that the upper part of the Relevant Segment was significantly more susceptible to navigation than the lower portion.

JA 268 at 9 (emphasis added).

### C.    The District Court Erred As A Matter Of Law In Refusing To Conclude That The Relevant Segment Was Navigated Or Was Susceptible To Navigation For Commerce.

Much of Harvey's geomorphological report focuses on the Narrows and Falls, a segment comprising approximately 2½ miles (JA 879 at 5).  In the face of the uncontradicted evidence of actual  navigation of the remaining portion of the Yadkin by Pearson, Macay, Deberry, and the histories of Wheeler and Hairston,

48

which Harvey never considered in rendering his opinion, the geomorphological evidence is insufficient to conclude the remainder was non-navigable for these reasons.

Harvey never observed the River in its natural state, because it is impounded. To recreate its hydrology before the four dams were built, Harvey used one gauge located at the Salisbury railroad bridge (River Mile 269.5). JA 278 at 158; JA 879 at 17, 43. This gauge recorded the flow of water draining into the Yadkin above the bridge, but did not account for water that entered from streams which joined it downstream, a fact Harvey admitted at trial. JA 278 at 175-176. The 1833 McRae-Brazier map (JA 518) shows ten named streams joining the Yadkin downstream from the bridge to the northern boundary of Montgomery County. Harvey's model indisputably did not account for water from these streams entering the relevant part of the Yadkin. JA 278 at 176-77. Of the entire 45-mile length of disputed riverbed, Harvey omitted water-flow inputs coming into the 35.5 miles downstream from the railroad bridge. This portion includes the entire "lower half" of the river referenced in the court's conclusion quoted above. Because Harvey's model is based on lower water levels than necessarily existed, it is insufficient to undermine the credibility of historical accounts of actual commercial navigation of that portion of the river upstream of the Narrows.

Harvey cites the Hixon/Jennings and Caldwell/Mitchell reports from 1818 commissioned by Archibald Murphey. However, contrary to Harvey's testimony, the Hixon/Jennings and Caldwell/Mitchell reports do not contradict Macay's and Pearson's 1796 accounts:

> The Hixon and Jennings report was a prescribed study to see what would be required to modify the Yadkin River from navigation in its natural state to accommodate boats of a specific size and shape. And that's what their mission was, and that's what they did. It did not address the navigability or the navigation of the river in its natural state."

JA 278 at 76-77. Specifically, the report related its purpose: "to afford a depth of two feet water in ordinary dry season over all the shoals, bars and ledges," for boats carrying "eighteen to twenty thousand weight." JA 1249 at 4.

Murphey tasked Caldwell and Mitchell to explore building a canal to bypass the Narrows and Falls along the Yadkin's western side.  JA 278 at 77; JA 1292. They were not tasked with examining or determining the navigability of any portions of the river.

> **D.    The District Court Erred As A Matter Of Law In Concluding That "The Relevant Segment Was Never Navigable For Commerce Nor Susceptible Thereto" And That If It Were "Navigable Or Susceptible For Navigation In Its Natural State, There Would Be No Need For Significant Improvement." (JA 268 at 9)**

The evidence shows that, except for the Narrows and Falls, the stretch of river at issue was actually navigated and used for commercial navigation close to and shortly after statehood utilizing the methods of transportation of the times. The fact that difficulties attended navigation does not contradict this. "Those rivers must be regarded as public navigable rivers in law which are navigable in fact." *Utah*, 283 U.S. at 76. "And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water." *Id.* "[T]he true test of the navigability of a stream does not depend on the mode by which commerce is, or may be, conducted, nor the difficulties attending navigation." *Id.*

Where there are any impediments to navigation, even where they do not prevent it, there is certainly "need" for improvement, especially to accommodate larger and faster vessels that will carry more cargo. The historical record includes discussion of efforts to "open," "facilitate" and "make" portions of the Yadkin River more navigable, or as Murphey put it in his 1819 "Memoir", "for improving its navigation." JA 607 at 16. By the time Murphey undertook his efforts, he and other forward thinking men were anticipating the need to make improvements to rivers to accommodate the use of steamboats. "[I]t would be a narrow rule to hold that in this country, unless a river was capable of being navigated by steam or sail

51

vessels, it could not be treated as a public highway." *Utah*, 283 U.S. at 76 (quoting *The Montello*, 87 U.S. 430, 441 (1874)).

### E. The District Court Erred As A Matter Of Law In Concluding That Lack Of Mention Of Navigation In The Moravian Records Was Persuasive Evidence Of Non-navigability. (JA 268 at 9)

While the The Moravian Records do not reveal their regular use of the Yadkin to transport their goods, "the extent of existing commerce is not the test. . . . where conditions of exploration and settlement explain the infrequency or limited nature of such use." *United States v. Utah*, 283 U.S. at 82. Here there were such conditions.

Salem, the Moravians' largest town, was founded in 1771. JA 278 at 96. From Salem, the Moravians took goods to Charleston to Cross Creek (now Fayetteville) on the Cape Fear River and to Salisbury. JA 278 at 234, JA 492 at 292. As Morrill acknowledged at trial, the Moravians had a commercial factor and ships at Charleston. JA 492 at 293. The Catawba-Wateree-Santee River, not the Yadkin, flows to Charleston. JA 492 at 293. The mouth of the Yadkin-Peedee River is Georgetown, South Carolina, which is at least 60 miles from Charleston. Murphey's 1819 "Memoir", noted that "the depth of water over the Bar at Georgetown," was a serious impediment to large-scale commercial navigation, a fact of which Morrill was unaware. JA 607 at 45, JA 492 at 295.

Governor Tryon and others desired to increase commerce with North Carolina, so instead of conducting trade through South Carolina ports, the Moravians were encouraged to send their goods to Cross Creek and thence down the Cape Fear to the port at Wilmington.  JA 278 at 235, 247; JA 492 at 293-4. The Yadkin flows nowhere near Cross Creek and could never have aided travel there.  (JA 492 at96)

The Moravians also went to Salisbury. However, neither Salem nor Salisbury is on the Yadkin.  Instead, the Moravians took their goods by wagon directly to the Trading Ford, where they forded or ferried across the river and proceeded six miles west to Salisbury. JA 278 at 241-2.  The road from Salem to Trading Ford clearly shown on the MacRae-Brazier Map is more direct, shorter and logistically easier than a land, water, land route via the Yadkin.

> The extent of existing commerce is not the test. . . . where conditions of exploration and settlement explain the infrequency or limited nature of such use, the susceptibility to use as a highway of commerce may still be satisfactorily proved.

*Utah*, 283 U.S. at 82.

As there are ample reasons apart from navigability for the Moravians not to have used the Yadkin to conduct their trade, the court's conclusion is erroneous.

**F.    The District Court Erred As A Matter Of Law In Concluding That Lt. General Nathanael Greene's Use Of The River As A Barrier Was Persuasive Evidence Of Non-navigability. (JA 268 at 9)**

Navigable or not, <u>all</u> rivers are barriers to overland travel and modes of transportation. Indeed the deeper and more easily navigable a river is the greater a barrier it will be because it cannot be forded and must be crossed by boat.

In any case, the only historical evidence of General Greene using the Yadkin as a barrier is when his army was being pursued by the vanguard of Cornwallis' Army in January-February 1781. The history of this event shows that the river's effect as a barrier there is immaterial to showing the river was not navigable. This story is related in two documents, Edward Steven's letter to Thomas Jefferson dated 8 February, 1781 and Colonel Banastre Tarleton's History of Campaigns. Stevens recounted:

> The Great Quantity of Rain that fell the night before raised the River in such a manner as made it difficult to Cross even in Boats.. . .  On the evening of the 3rd Inst. the enemy appeared at the River tho by this time we had Compleated Crossing . . ., as there was a Party of Virginia Rifflemen of about a Hundred under the Command of Major Campbell, and a small party of North Carolinia Militia Horse was formed in ambush to receive them with Orders to give them a fire or Two and then Disperse down the River and Cross in Canoes which they executed very well and with but a very Triffleing loss on their part.[sic]

JA 573.

Colonel Tarleton stated that British General followed Morgan's troops from Salisbury to Trading Ford but discovered, "after a skirmish", they had already crossed and were set up on the opposite shore.  Tarleton's account confirms it had been raining heavily.  He further reported that the British attempted in vain to gain

54

possession of Greene's "flats and large boats" on the river, and, "on account of the advantageous position of the enemy and  the depth of the river" they could not attempt crossing at Trading Ford and subsequently went further up river to cross. JA 751 at 5.

As a matter of law this evidence fails to support a conclusion that the river was not navigable.

## CONCLUSION

For the reasons stated herein, the State urges this honorable Court:

1.  To vacate the trial Court's judgments for lack of jurisdiction and to remand the matter for further remand to the North Carolina General Courts of Justice in which it was filed; or, in the alternative,

2.    To vacate the trial Court's partial judgment on navigability based on this Court's *de novo* review of the trial Court's errors of law and clearly erroneous findings of fact; and,

3.    To vacate the trial Court's erroneous entries of summary judgment based on the N.C. Marketable Title Act and adverse possession and remand the matter for a full trial in which the defendant would bear the burden of proving a connected chain of title to the submerged lands it claims to own; and,

4.    To allow for oral argument in this case.

Respectfully submitted this the 31st day of March 2016.

ROY COOPER
ATTORNEY GENERAL

/s/Donald R. Teeter, Sr.
Donald R. Teeter, Sr.
Senior Deputy Attorney General

/s/Ann W.Matthews
Ann W. Matthews
Special Deputy Attorney General

/s/G. Mark Teague
G. Mark Teague
Assistant Attorney General

/s/Lewis W. Lamar, Jr.
Lewis W. Lamar, Jr.
Assistant Attorney General

N.C. Department of Justice
Post Office Box 629
114 West Edenton Street
Raleigh, NC 27602
Telephone: (919) 733-7408
Facsimile: (919) 733-2947

Attorneys for Plaintiff-Appellant

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND LENGTH LIMITATIONS

1.      This brief has been prepared using (SELECT AND COMPLETE ONLY ONE):

  X    Fourteen point, proportionally spaced, serif typeface (such as
           CG Times or Times New Roman, **NOT** sans serif typeface such as
           Arial).  Specify software name and version, typeface name, and
           point size below (for example, WordPerfect X3, CG Times, 14 point)

        Word 2010, Times New Roman, 14 Point

  _____ Twelve point, monospaced typeface (such as Courier or Courier
           New).  Specify software name and version, typeface name, and
           point size below (for example, WordPerfect X3, Courier, 12 point):


2.      EXCLUSIVE of the corporate disclosure statement; table of contents; table of citations; statement with respect to oral argument; any addendum containing statutes, rules, or regulations, and the certificate of service, the brief contains (SELECT AND COMPLETE ONLY ONE):

  ____  ____ Pages (give specific number of pages; may not exceed 30 pages for
           opening or answering brief or 15 pages for reply brief unless brief is
           within word or line limits listed below); **OR**

  X   13,839 Words (give specific number of words; may not exceed 14,000
           words for opening or answering brief or 7,000 for reply brief); **OR**

  ____  _____ Lines of Monospaced Type (give specific number of lines; may not
           exceed 1,300 lines for opening or answering brief or 650 for reply brief;
           may be used **ONLY** for briefs prepared in monospaced type such as
           Courier or Courier New).

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.  If the Court so directs, I will provide an electronic version of the brief and/or copy of the word or line print-out.

           /s/ Donald R. Teeter
           Signature of Filing Party

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of March, 2016, I electronically filed the foregoing Brief of APPELLANT with the Clerk of Court using the CM/ECF System, which will send notice of such filing to counsel registered CM/ECF USERS and I hereby certify that I have mailed the document to the following non CM/ECF participants:

This the 31st day of March, 2016.

Electronically Submitted